FILED

2026 Mar-31  AM 10:59
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

**NORTHERN DATA NY, LLC,**

> **Plaintiff,**

**v.**

**PAUL ROGERS,**

> **Defendant.**

**Case No.: 2:24-cv-771-HDM**

### MEMORANDUM OPINION AND ORDER

Plaintiff Northern Data NY, LLC ("Northern Data") sues Defendant Paul Rogers, asserting a single claim for breach of guaranty, (doc. 1), and this matter is now before the court on the parties' fully briefed cross-motions for summary judgment, (docs. 84, 85, 92, 94, 96, 97). After careful consideration of the briefing, record, and applicable law, along with the benefit of oral argument, the court will **GRANT** Northern Data's Motion, (doc. 85), and **DENY** Rogers's Motion, (doc. 84).

### FACTUAL BACKGROUND

This case arises from a sales transaction between Northern Data and Onyx Digital Farms, LLC ("Onyx"). Onyx is not a party to this litigation, (*see* doc. 1, ¶¶ 1–2), as the sole defendant is its former president, Paul Rogers, (docs. 1, ¶¶ 2, 8; 44 at 6, ¶ 2). Northern Data is a limited liability company organized under Delaware

law and headquartered in Virginia,[1] (docs. 40, ¶¶ 3–4; 41), that "trades in sophisticated computing equipment used in high-performance data centers," (doc. 29 at 2). Defendant Rogers is a citizen of Alabama, (docs. 1, ¶ 2; 43 at 1, ¶ 2), with a degree in marketing from the University of Alabama at Birmingham and a technical certificate in computer networking from Anshan Normal University in China, (doc. 86-1 at 5, 9:19–11:4). Rogers has extensive professional experience as a technical consultant for sophisticated companies such as AT&T and the Walt Disney Corporation. *Id.* at 5–6, 11:17–15:10. At the times relevant to this lawsuit, Rogers was the president of Onyx, (docs. 1, ¶ 8; 44 at 6, ¶ 2; 50-3, ¶ 2; 79-3, ¶ 2), and all parties agree he was authorized to act on its behalf. Indeed, Rogers testified at his deposition that he was appointed president expressly for the purpose of supervising Onyx's deal with Northern Data. (Doc. 86-1 at 8, 22:14–19).

On September 1, 2022, Northern Data and Onyx executed a sales contract styled "Hardware Sale and Purchase Agreement" (the "Original Agreement"), in which Northern Data agreed to sell Onyx computer hardware used for mining Bitcoin. (Docs. 50-3, ¶ 4; 86-2 at 3, ¶ 3). In the weeks following the execution of the

---

[1] Northern Data is a limited liability company whose sole member is Peak Mining, LLC. (Doc. 37, ¶ 3). Peak Mining is itself a limited liability company whose sole member is Northern Data US, Inc., a corporation owned by Northern Data AG, a German corporation. *Id.* The court has previously satisfied itself that it has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds $75,000. (Doc. 41).

Original Agreement, Northern Data and Onyx agreed that it needed to be revised to clarify important details of the sale, such as the overall purchase price and quantity of goods. (Doc. 83-1 at 51). During this process, Rogers, as president of Onyx, communicated by email with Nicolaas "Niek" Beudeker, an employee and representative of Northern Data, to negotiate the terms of the revision. *Id.* at 47–53. During this correspondence, Beudeker suggested the possibility of Rogers personally guaranteeing Onyx's obligations as part of the sale, but Rogers tacitly rejected this proposal. (Doc. 74-1).

On October 6, 2022, after Northern Data and Onyx agreed on the appropriate changes to the Original Agreement, J.R., an attorney representing Northern Data,[2] sent an email to Rogers stating that she would "prepare the necessary revisions [to the Original Agreement] and circulate for signatures." *Id.* at 3. Later that same day, J.R. sent the following email to Rogers and Onyx's founder, Basham Johnson, with Beudeker copied:

All, attached are the revised documents as agreed:

1. Further amended Amendment to [the Original Agreement] (reflecting revised totals and reference to the second priority lien)
2. A form of security agreement evidencing the second priority lien
3. A form of promissory note . . .

. . .

---

[2] The parties have agreed to refer to J.R. solely by her initials. (Doc. 87 at 3 n.4).

3

> Please let me know if anyone has any questions/comments. In the interest of timing, I am circulating this simultaneously for both internal and external review. Please confirm once approved so that I can send via [DocuSign] for signatures.

(Docs. 50-3, ¶ 8; 74-1 at 2). J.R.'s email neither referenced nor attached a personal guaranty, (doc. 50-3, ¶ 11), and Rogers approved the documents attached to the email for the transaction to proceed, (docs. 86-1 at 9, 26:22–27:1; 87 at 4, ¶ 10).

On October 12, 2022, J.R. sent Rogers a packet of documents to sign via DocuSign, (doc. 87 at 5, ¶ 14), stating that they were "the documents that need to be signed in order to consummate the purchase and sale . . . ." (Docs. 50-3, ¶ 12; 86-1 at 22). By his own admission, Rogers "assumed the documents . . . were the same documents . . . provided to him on October 6, 2022," and so he "clicked to execute the DocuSign version of the final documents." (Doc. 87 at 5, ¶ 15). From the beginning of this case, Rogers has consistently admitted that he voluntarily signed all of the documents in the DocuSign packet: he admitted it in his counterclaim,[3] (doc. 44 at 7, ¶ 12), he testified as much at his deposition, (doc. 86-1 at 11, 33:17–34:19), he admitted it in both his own Motion for Summary Judgment, (doc. 87 at 5–6, ¶¶ 15, 16, 20), and in his response to Northern Data's Motion, (doc. 96 at 4), and, in an affidavit at the motion-to-dismiss stage, he stated that he "simply cannot deny that [he] may have been deceived into electronically signing the personal

---

[3] By prior order, the court dismissed Rogers's counterclaims for failure to plead factual allegations with the particularity required for fraud. (Doc. 56).

[guaranty] by trusting Northern Data and not carefully reviewing the contents of the October 12, 2022 email," (doc. 50-3, ¶ 16). Moreover, the record shows that J.R. sent the DocuSign to the same email address Rogers has admitted to using, (*compare* doc. 74-1 at 2 *with* doc. 86-1 at 22), he does not suggest that any other person forged his electronic signature, (doc. 86-1 at 11, 35:20–23), and he admits the legitimacy of the other documents included in the same DocuSign from October 12, 2022, (doc. 87 at 2, ¶ 2). With this single click of DocuSign, Rogers electronically signed three documents that are relevant to the resolution of the parties' cross-motions for summary judgment: (1) the Amended Agreement, (2) the Non-Negotiable Promissory Note, and (3) the Personal Guaranty at the heart of this case. There is no dispute between the parties as to the contents of any of these documents, as they have produced identical, executed copies of each. (*Compare* doc. 83-2 at 29–45 *with* doc. 86-1 at 24–40).

The first relevant document Rogers executed on October 12, 2022, was the Amended Agreement, which states that the parties were modifying the Original Agreement because "certain payments required . . . were not made when due, and closing did not occur when anticipated, and the parties now desire to make certain acknowledgements and amend certain of the terms." (Docs. 83-2 at 29; 86-1 at 24). In the Amended Agreement, Onyx agreed to pay Northern Data a total of $1,427,660 for the computer hardware: a lump sum payment of $950,000 on or before October

13, 2022 (the "Initial Deposit"), and then the remaining $477,660 in four equal installments, to be paid within 120 days (the "Deferred Amount"). (Docs. 83-2 at 30; 86-1 at 25). The Amended Agreement provided that, if Onyx was late in paying any portion of the Initial Deposit or the Deferred Amount, Northern Data could charge Onyx interest on the outstanding sum at a rate of fifteen percent per annum, calculated daily and compounded monthly. (Docs. 83-2 at 30; 86-1 at 25). The Amended Agreement bears the signature of Paul Rogers as President of Onyx and Christopher Yoshida as President of Northern Data. (Docs. 83-2 at 32; 86-1 at 27). Although the Amended Agreement states it was executed on September 28, 2022, (docs. 83-2 at 32; 86-1 at 27), the parties agree that the real date was October 12, 2022. (Docs. 87 at 2, ¶ 2; 89 at 3, ¶ 4).

The second relevant document Rogers executed via DocuSign on October 12, 2022, was the Non-Negotiable Promissory Note (the "Promissory Note"), which states that it is issued in conjunction with the Original Agreement as revised by the Amended Agreement. (Docs. 83-2 at 33; 86-1 at 28). In the Promissory Note, Onyx agreed to pay the Deferred Amount of $477,660, plus accrued and unpaid interest, to Northern Data in four, equal monthly installments, with the full amount due on or before January 31, 2023. (Docs. 83-2 at 33; 86-1 at 28).[4] The Promissory Note

---

[4] To secure the Promissory Note, Northern Data took a lien on the computer hardware it was selling to Onyx. (Docs. 83-2 at 33; 86-1 at 28).

establishes that the Deferred Amount is to bear simple interest at a rate of fifteen percent per annum, calculated daily and compounded monthly. (Docs. 83-2 at 33; 86-1 at 28). The Promissory Note bears the date of October 12, 2022, (docs. 83-2 at 33, 36; 86-1 at 28, 31), and the sole signature of Paul Rogers as President of Onyx Farms, (docs. 83-2 at 36; 86-1 at 31). Beudeker testified that this is the only Promissory Note that Onyx has ever executed in favor of Northern Data, (doc. 86-2 at 4, ¶ 9), and Rogers similarly admitted he does not "think there are any other promissory notes between Onyx and Northern [Data], to [his] knowledge," (doc. 86-1 at 12, 39:18–40:5).

The third relevant document Rogers executed on October 12, 2022, was the Personal Guaranty at the heart of this case. The Personal Guaranty identifies Rogers as the "Guarantor," and then provides as follows:

> Guarantor absolutely, unconditionally and irrevocably guarantees, as primary obligor and not merely as surety, the full and punctual payment and performance of all present and future obligations, liabilities, covenants and agreements required to be observed and performed or paid and reimbursed by [Onyx] under or relating to the [Promissory Note], plus all costs, expenses and fees (including the reasonable fees and expenses of [Northern Data's] counsel) in any way relating to the enforcement or protection of [Northern Data's] rights.

(Docs. 83-2 at 42; 86-1 at 37). The Personal Guaranty provides that Rogers's obligations thereunder are "irrevocable, continuing, absolute and unconditional" and he expressly waived all defenses to enforcement. (Docs. 83-2 at 42; 86-1 at 37). Rogers waived his right to revoke the Personal Guaranty and acknowledged that it

is "continuing in nature and applies to all presently existing and future [o]bligations, until the complete, irrevocable and indefeasible payment and satisfaction" of all of Onyx's obligations to Northern Data under the Amended Agreement. (Docs. 83-2 at 43; 86-1 at 38). He further represented that the Personal Guaranty "constitutes [his] valid and legally binding agreement," (docs. 83-2 at 43; 86-1 at 38), and agreed that it shall be governed and construed in accordance with the laws of the State of New York, (docs. 83-2 at 43–44; 86-1 at 38–39). He irrevocably waived his right to a jury trial arising from the Personal Guaranty or any of his obligations assumed thereunder. (Docs. 83-2 at 44; 86-1 at 39). The Personal Guaranty bears the sole signature of Paul Rogers as "Guarantor." (Docs. 83-2 at 45; 86-1 at 40).

To be clear about the pertinent documents executed on October 12, 2022: Onyx and Northern Data signed the Amended Agreement by which Northern Data agreed to sell computer hardware to Onyx. The Amended Agreement provided that the total price for this sale would be $1,427,660, divided between an Initial Deposit of $950,000, and a Deferred Amount of $477,660. The Deferred Amount was to be split over four payments and due on or before January 31, 2023. Northern Data and Onyx signed the Promissory Note to cover the Deferred Amount and Rogers signed the Personal Guaranty obliging him to cover all of Onyx's obligations arising under the Promissory Note.

After executing the Amended Agreement, the Promissory Note, and the Personal Guaranty on October 12, 2022, Onyx paid the Initial Deposit of $950,000, (doc. 86-2 at 60), but it never paid any portion of the Deferred Amount of $477,660, (docs. 1, ¶ 15; 44 at 2, ¶ 15; 86-2 at 61; 87 at 6, ¶ 19). After the deadline for full payment passed, Onyx and Northern Data discussed options for how Onyx could discharge its obligation to pay the Deferred Amount, but such discussions were fruitless, largely because Onyx "ignored [Northern Data's] overtures to finalize the settlement agreement, and made none of the payments contemplated by the agreement." (Doc. 86-2 at 61–62). After the breakdown in communication, Northern Data commenced arbitration proceedings with the American Arbitration Association, (docs. 1, ¶ 12; 44 at 2, ¶ 12; 86-2 at 59–64, 66), and it was through this process that Rogers first learned of the Personal Guaranty bearing his signature, (doc. 50-3, ¶ 14).

The arbitrator received and reviewed documents from both Northern Data and Onyx, held an evidentiary hearing, and issued the Award of Arbitrator on May 29, 2024. (Doc. 86-2 at 59). In the Award, the arbitrator found that Onyx breached the terms of the Amended Agreement and the Promissory Note by failing to pay the Deferred Amount on or before January 31, 2023. *Id.* The arbitrator awarded Northern Data the sum of $558,169.38, comprised of the following: (1) $477,660 to cover the Deferred Amount, (2) attorneys' fees and expenses in the amount of

$68,795, and (3) $11,714.38 in administrative arbitration fees. *Id.* at 59–64. The arbitrator also awarded interest on the Deferred Amount at a rate of fifteen percent per annum, calculated daily and compounded monthly, beginning on November 1, 2022, and continuing until either Onyx paid the award or a court of competent jurisdiction confirmed the award, whichever happened first.[5] *Id.*

After the arbitrator issued this award, Northern Data petitioned this court to confirm its terms. (Doc. 86-2 at 66). This court did so on July 24, 2025, and ordered Onyx to pay Northern Data the full $558,169.38 flat sum awarded by the arbitrator, plus $225,726.71 in accrued interest calculated through June 30, 2025,[6] and $28,423.32 in attorneys' fees incurred between arbitration and the court's order. *Id.* at 66–67, 71. To be clear, this court entered judgment against Onyx based on the following:

| | |
|---|---|
| Deferred Amount | $477,660.00 |
| Accrued Interest as of June 30, 2025 | $225,726.71 |
| Arbitration Attorneys' Fees | $68,795.00 |
| Administrative Arbitration Fees | $11,714.38 |
| Post-Arbitration Attorneys' Fees | $28,423.32 |

---

[5] This is the interest rate that Northern Data and Onyx agreed to in the Promissory Note. (Docs. 83-2 at 33; 86-1 at 28).

[6] Interest ceased to accrue upon this court's confirmation of the arbitrator's award. (Doc. 86-2 at 59).

**Total**                                                         **$812,319.41**

(Doc. 86-2 at 5, ¶ 13). Just as it failed to pay the Deferred Amount, Onyx failed to

pay this sum (the "Debt") to Northern Data, (docs. 1, ¶ 15; 44, ¶ 15; 86-2 at 5, ¶ 14),

and Rogers, by his own admission, has not paid the Debt on Onyx's behalf, (doc.

86-1 at 13, 41:12–16). Northern Data now sues Rogers for breaching the Personal

Guaranty, (doc. 1), and the parties have each moved for summary judgment.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 mandates that a "court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). *See also Hoffman v. Allied Corp.*, 912 F.2d 1379, 1382 (11th Cir. 1990).

The party moving for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion, and identifying those portions

of the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, which it believes demonstrate the absence

of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986) (internal quotation marks omitted). The party opposing summary judgment

must designate specific facts showing that there is a genuine issue for trial. *Id.* at

324. The court will construe all facts in the light most favorable to the non-movant.

*Domante v. Dish Networks, LLC*, 974 F.3d 1342, 1345 (11th Cir. 2020) (per curiam). This standard remains the same when ruling on cross-motions for summary judgment, which "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *Ala. Space Sci. Exhibit Comm'n v. Markel Am. Ins. Co.*, 557 F. Supp. 3d 1199, 1207 (N.D. Ala. 2021) (internal quotation marks omitted). *See also United States v. Oakley*, 744 F.2d 1553, 1555–56 (11th Cir. 1984).

## ANALYSIS

Northern Data's sole claim against Rogers alleges that he breached the Personal Guaranty he signed on October 12, 2022, by failing to pay the Debt on Onyx's behalf after it failed to do so. (Doc. 1). New York law, which governs the Personal Guaranty, (docs. 83-2 at 43–44; 86-2 at 34–35), defines a guaranty as "a written instrument [in which] a person 'guarantees' payment of another's debt and describes with precision the obligation to which the person is bound,"[7] *Lakhaney v. Anzelone*, 788 F. Supp. 160, 163 (S.D.N.Y. 1992). Guaranties are governed by the rules "generally applicable to contracts," *id.*, and, to succeed on its claim, Northern Data must demonstrate the following: "(1) an absolute and unconditional guaranty,

---

[7] This court will defer to the parties' choice of New York law because it is not contrary to Alabama law or public policy. *Wells Fargo Bank, N.A. v. Ir. Pub & Grill, Inc.*, No. 2:13-cv-1884, 2015 WL 1586701, at *3 n.2 (N.D. Ala. Apr. 9, 2015).

(2) the underlying debt, and (3) the guarantor's failure to satisfy the unpaid debt," *Keybank Nat'l Ass'n v. Nour Limo, Inc.*, 345 F.R.D. 555, 563 (E.D.N.Y. 2024) (internal quotation marks omitted); *City of N.Y. v. Clarose Cinema Corp.*, 681 N.Y.S.2d 251, 253 (N.Y. App. Div. 1998). All three elements are required, or the claim fails as a matter of law. *See Myers Indus., Inc. v. Schoeller Arca Sys., Inc.*, 171 F. Supp. 3d 107, 121 (S.D.N.Y. 2016).

The Eleventh Circuit has held that cross-motions for summary judgment "may be probative of the nonexistence of a factual dispute," *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 83 F.4th 922, 926 (11th Cir. 2023) (internal quotation marks omitted), and that is certainly the case here: the parties are in complete agreement on the relevant facts of this case and they differ only in the legal conclusions to be drawn from those facts. They have produced identical, executed copies of the Amended Agreement, the Promissory Note, and the Personal Guaranty, (docs. 83-2 at 29–45; 86-1 at 24–40), they agree that Rogers voluntarily signed the Personal Guaranty, (docs. 44 at 7, ¶ 12; 50-3, ¶ 16; 86-1 at 11, 33:17–34:19; 87 at 5–6, ¶¶ 15, 16, 20), and they agree that Onyx did not pay Northern Data the Deferred Amount of $477,660 per the terms of the Promissory Note, (docs. 1, ¶ 15; 44 at 2, ¶ 15; 86-2 at 61; 87 at 6, ¶ 19). Northern Data has produced—and Rogers does not challenge— the arbitrator's award of $558,169.38, plus interest, (doc. 86-2 at 59), and the final judgment from this court affirming that award, along with additional interest and

attorneys' fees, for a total Debt of $812,319.41, *id.* at 66–71. Finally, the parties agree that Rogers has not paid Northern Data anything in connection with the Promissory Note, (docs. 1, ¶ 16; 86-1 at 13, 41:12–16), including the Debt. The parties' agreement on all of the above means there is no dispute that Northern Data can satisfy the second and third elements in its breach of guaranty claim because the undisputed evidence outlined *supra* shows an underlying debt that Rogers has not paid. *See Keybank Nat'l Ass'n*, 345 F.R.D. at 563. Thus, the parties' cross-motions for summary judgment will be resolved on the first element: the existence of an absolute, unconditional guaranty. *Id.* Rogers tacitly recognizes as much, as he devotes the entirety of his brief to arguing that the Personal Guaranty—which, it bears repeating, he admits he signed voluntarily—cannot bind him to cover the Debt on Onyx's behalf.[8]

In New York, a guaranty is absolute and unconditional if it contains "language obligating the guarantor to payment without recourse to any defenses or counterclaims." *605 Fifth Prop. Owner, LLC v. Abasic, S.A.*, No. 22-945, 22-3195,

---

[8] It is true that Rogers frames his Motion for Summary Judgment around the theory that there is no underlying debt, (doc. 84 at 1–2), but a critical reading of his brief makes it clear that he is **not** arguing that Onyx has no underlying obligation to Northern Data and he is really contesting the validity and enforceability of the Personal Guaranty, (*see generally* doc. 87). Rogers has admitted that Onyx and Northern Data executed the Promissory Note obligating Onyx to pay Northern Data a total of $1,427,660, *id.* at 11, and he does not challenge the arbitrator's award or this court's decision affirming it. Rather, Rogers's whole argument on summary judgment relates to the reduction of the debt to writing and, therefore, is rooted in the first element of Northern Data's claim: the existence and enforceability of an unconditional guaranty. *Keybank Nat'l Ass'n*, 345 F.R.D. at 563.

2023 WL 4417343, at *1 (2d Cir. July 10, 2023) (quoting *Cooperatieve Centrale Raiffeisein-Boerenleenbank, B.A. v. Navarro*, 25 N.Y.3d 485, 493 (N.Y. 2015)). The court looks for "broad, sweeping and unequivocal language" that "foreclose[s] any challenge to the enforceability of the agreement." *Red Fort Cap., Inc. v. Guardhouse Prods. LLC*, No. 19-cv-686, 2022 WL 118637, at *4 (S.D.N.Y. Jan. 11, 2022). Mindful of the Eleventh Circuit's order to "take each motion in turn" when ruling on cross-motions for summary judgment, *Thai Meditation Ass'n of Ala.*, 83 F.4th at 926, the court will consider each of the parties' positions on whether Rogers was bound by an absolute and unconditional guaranty.

    a.  <u>Northern Data's Motion</u>

Northern Data has carried its burden of demonstrating an absolute, unconditional guaranty binding upon Rogers. Northern Data relies on the plain terms of the Personal Guaranty that Rogers admits he signed, (doc. 89 at 7), in which he "absolutely, unconditionally and irrevocably guarantee[d] . . . the full and punctual payment and performance of all present and future obligations . . . required to be observed and performed or paid and reimbursed by [Onyx] under or relating to" the Promissory Note, (docs. 83-2 at 42; 86-1 at 37). The Personal Guaranty provides that Rogers's obligations thereunder are "irrevocable, continuing, absolute and unconditional" and he expressly waived all defenses to enforcement. (Docs. 83-2 at 42; 86-1 at 37). This is exactly the sort of "broad, sweeping and unequivocal

15

language," *Red Fort Cap., Inc.*, 2022 WL 118637, at \*4, "obligating [him] to payment without recourse to any defenses or counterclaims," *605 Fifth Prop. Owner, LLC*, 2023 WL 4417343, at \*1, that New York requires for a breach of guaranty claim.

Northern Data attempts to head off Rogers's primary argument against the Personal Guaranty by correctly pointing out that, in New York, a person who signs a contract is deemed to have read it and agreed to its terms, even if he did not actually do so. (Doc. 89 at 8). "[U]nder New York law, a signatory to a contract has the responsibility to read the contract he or she signs and is bound by the terms that are in an executed contract." *Paraco Gas Corp. v. Travelers Cas. and Sur. Co. of Am.*, 51 F. Supp. 3d 379, 393 (S.D.N.Y. 2014). New York's highest court has held that "[b]ecause contract formation is governed by an objective rather than a subjective standard, there is no requirement that a party have correctly understood—or even reviewed—the terms presented by the offeror for their manifestation of acceptance to be effective." *Wu v. Uber Tech., Inc.*, 43 N.Y.3d 288, 299 (N.Y. 2024). Once clear contractual terms are presented to an offeree, it becomes his or her responsibility "before manifesting assent, to 'inquire' further by reading and assessing the proposed terms to determine whether they are acceptable. **Under well-established law, a person who accepts a written contract without first undertaking this review generally bears the risk that the agreement may contain provisions they**

16

**do not like or expect**." *Id.* at 299–300 (emphasis added). This is a longstanding, well-settled principle of New York law: even in 1920 it had already "often been held that when a party to a written contract accepts it as a contract he is bound by the stipulations and conditions expressed in it whether he reads them or not." *Metzger v. Aetna Ins. Co.*, 227 N.Y. 411, 416 (N.Y. 1920). Accordingly, New York courts regularly enforce contracts that were voluntarily signed, even if the signatory did not read it and might object to its terms. *See, e.g.*, *Morris v. Snappy Car Rental*, 84 N.Y.2d 21, 30 (N.Y. 1994). Rogers's repeated protestations that he did not realize what he was signing cannot excuse him from complying with the terms of the Personal Guaranty. By his own admission, he voluntarily signed it, and New York law establishes a presumption that he read it and agreed to its broad, unequivocal terms.

Northern Data admits that the Personal Guaranty has an error in it insofar as it states that it is meant to guarantee Onyx's performance under the Promissory Note dated September 28, 2022, because the real date was October 12, 2022. (Doc. 89 at 10–11). Northern Data relies on *82–90 Broadway Realty Corporation v. New York Supermarket, Inc.*, 62 N.Y.S.3d 186 (N.Y. App. Div. 2017) (hereinafter "*Broadway*"), for the proposition that this error does not render the Personal Guaranty unenforceable, *id.*, and the court agrees. In *Broadway*, Plaintiff 82-90 Broadway Realty Corporation leased commercial property to Defendant New York

17

Supermarket in a lease dated January 15, 2000. *Broadway*, 62 N.Y.S.3d at 187. In

March of 2001, Defendant Long Deng executed a personal guaranty covering New

York Supermarket's obligations under the lease, *id.*, but there was a typographical

error in the guaranty that said it applied to a lease that began on January 15, 2001,

not 2000, *id.* After New York Supermarket defaulted on the lease and Deng failed

to guarantee those same obligations, 82-90 Broadway sued, alleging breach of

contract and breach of a personal guaranty. *Id.* Deng argued to the trial court that he

could not be held liable under the personal guaranty because it only referred to a

lease that began on January 15, 2001, when the lease that was really the subject of

the guaranty began on January 15, 2000. *Id.* The trial court rejected this argument,

granted 82-90 Broadway's motion for summary judgment, and Deng appealed. *Id.*

On appeal, the New York Supreme Court affirmed the trial court and rejected

Deng's contention that the typographical error in the guaranty rendered it

unenforceable. *Id.* at 188. The court held:

> Contrary to the defendants' contention, the typographical error in the
> guaranty relating to the year of the lease did not render the guaranty
> unenforceable. **Where there is no mistake about the agreement and
> the only mistake alleged is in the reduction of that agreement to
> writing, such mistake of the scrivener, or of either party, no matter
> how it occurred, may be corrected.** In such a case, there is no need to
> reform the contract. In the absence of a claim for reformation, courts
> may as a matter of interpretation carry out the intentions of the parties
> by transposing, rejecting, or supplying words to make the meaning of
> the contract more clear.

18

*Id.* (internal citations, quotation marks, and brackets omitted) (emphasis added). The appellate court affirmed the lower court's finding that the parties were of one mind by considering that the guaranty referred to the same parties, premises, and date of the lease, just for the wrong year. *Id.* Perhaps most crucially for Rogers and Northern Data, the *Broadway* court affirmed the lower court's reliance on the fact that there was no other lease to which the guaranty could apply. *Id.* Federal courts applying New York contract law have relied on *Broadway* for the proposition that a court may equitably correct a contract that in some way fails to express the parties' true, mutual intentions. *See, e.g.*, *Washington v. NYC Med. Practice, P.C.*, No. 18-cv-9052, 2021 WL 918753, at *5 (S.D.N.Y. Mar. 10, 2021). *Broadway* is, therefore, a straightforward application of the longstanding principle of New York law that "a court may correct a scrivener's error outside of a claim for reformation of a contract in those limited instances where some absurdity has been identified." *NCCMI, Inc. v. Bersin Props., LLC*, 226 A.D.3d 88, 94 (N.Y. App. Div. 2024) (internal quotation marks omitted).

The court finds *Broadway* dispositive of the issue of the incorrect date in the Personal Guaranty because "there is no mistake about the agreement [between Rogers and Northern Data] and the only mistake . . . is in the reduction of that agreement to writing." *Broadway*, 62 N.Y.S.3d at 188. The Personal Guaranty specifically refers to both Onyx and Northern Data and states that it is intended to

secure a promissory note between them. (Docs. 83-2 at 42; 86-1 at 37). During the process of revising the Original Agreement, Rogers and Beudeker expressly discussed the possibility of Rogers guaranteeing Onyx's obligations in the specific sale contemplated by the Original Agreement, the Amended Agreement, and the Promissory Note. (Doc. 74-1 at 4–5). There is no dispute that Onyx and Northern Data have only executed one promissory note, (docs. 86-1 at 12, 39:18–40:5; 86-2 at 4, ¶ 9), which they did at the same time Rogers executed the Personal Guaranty. Rogers argues that it "strains credulity to suggest the disputed Personal Guaranty must have intended to reference the October 12, 2022 Promissory Note rather than the clearly stated (and nonexistent) September 28, 2022 Promissory note," (doc. 94 at 12), but the court finds it would strain credulity to a far greater degree to suggest that Rogers intended to guarantee a nonexistent note at the same time he was executing the only note that has ever existed between Onyx and Northern Data. As in *Broadway*, there is no other obligation to which Rogers's Personal Guaranty could apply, *Broadway*, 62 N.Y.S.3d at 188–89, and it would be absurd for the court to find that Rogers actually intended to secure a non-existent note dated September 28, 2022, *NCCMI, Inc.*, 226 A.D.3d at 94. The court therefore finds that "the error is obvious and the drafters' intention clear," *id.*, and it will interpret the Personal Guaranty to carry out Rogers and Northern Data's intention that he guarantee the Promissory Note they executed on October 12, 2022.

In his response to Northern Data's Motion for Summary Judgment, (doc. 94), as distinguished from his own Motion, discussed *infra*, Rogers makes a variety of unavailing arguments in an attempt to undermine the Personal Guaranty. He places great emphasis on the opaque process by which Northern Data included the Personal Guaranty in the DocuSign after he indicated he would not sign one, but, as stressed *supra*, the sole, determinative point is that, regardless of how it got there, he had the opportunity to review it and then he voluntarily signed it. *Paraco Gas Corp.*, 51 F. Supp. 3d at 393; *Wu*, 43 N.Y.3d at 299. It is immaterial that he now claims he never "agreed to or intended" to execute the Personal Guaranty, (doc. 94 at 14), because his voluntary signature establishes an unrebutted presumption that he did, particularly in light of his education and professional background, *Morris*, 84 N.Y.2d at 30. This principle also disposes of his argument that Northern Data "cannot present clear and convincing evidence that [he] mutually assented to execution of the Personal Guaranty," (doc. 94 at 10), because his voluntary signature is proof of just that, *Wu*, 43 N.Y.3d at 299–300.

Rogers argues that the court may not interpret the Personal Guaranty in such a way as to replace the incorrect date with the correct date because reformation must be specifically pleaded and Northern Data has not done so. (Doc. 94 at 8). As stated *supra*, while this is generally true, New York law recognizes an exception that allows a court to enforce the parties' true mutual intention outside of an action for

21

reformation when, as here, there is no mistake about their agreement and the only error is in the reduction of that agreement to writing, *NCCMI, Inc.*, 226 A.D.3d at 93–94; *Broadway*, 62 N.Y.S.3d at 188. He also argues that the Personal Guaranty is unenforceable because none of the other relevant documents—the Amended Agreement or the Promissory Note—reference it, (doc. 94 at 12), but he provides no argument or authority to explain how this omission undermines the Personal Guaranty as a valid, enforceable contract in and of itself. On the contrary, the Personal Guaranty explicitly states that it is "independent of the obligations of [Rogers] under" the Promissory Note. (Docs. 83-2 at 43; 86-1 at 38). Finally, Rogers opposes Northern Data's Motion by arguing that summary judgment is inappropriate because he is entitled to a trial on his affirmative defenses, (doc. 94 at 14), but, again, he cites no authority for this proposition. Indeed, courts reject this argument because "[t]he right to a jury trial attaches to all the factual issues associated with **legal claims**," not affirmative defenses. *CPI Plastics, Inc. v. USX Corp.*, 22 F. Supp. 2d 1373, 1377 (N.D. Ga. 1995) (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959)) (emphasis added).

For all of these reasons, Northern Data has demonstrated the existence of an irrevocable guaranty and Rogers has failed to create a fact question on this point. Because, as discussed *supra*, there is no dispute between the parties as to the other elements, Northern Data is entitled to summary judgment on its breach of guaranty

claim because the undisputed facts show (1) an absolute and unconditional guaranty, (2) the underlying debt, and (3) the guarantor's failure to satisfy the unpaid debt, *Keybank Nat'l Ass'n*, 345 F.R.D. at 563.

### b. Rogers's Motion

Although Northern Data's Motion for Summary Judgment is due to be granted, *supra*, the Eleventh Circuit requires this court to consider Rogers's own Motion as well, *Thai Meditation Ass'n of Ala., Inc.*, 83 F.4th at 926. This is easily done: the parties' substantial agreement on the facts of this case means that, in Rogers's Motion, he simply advances the same legal theories he used in opposition to Northern Data's Motion, all of which are insufficient for the reasons discussed *supra*.

Rogers has consistently asserted that, although he signed the Personal Guaranty voluntarily, he did not realize what he was signing. (Doc. 87 at 10). Even accepting this as true, it is insufficient to excuse him from complying with its terms because New York law holds that he fully read and assented to anything he signed. *Paraco Gas Corp.*, 51 F. Supp. 3d at 393; *Wu*, 43 N.Y.3d at 299. Rogers's assertions that he, in actuality, rejected the possibility of a personal guaranty and never would have signed one cannot overcome this presumption because "[u]nder well-established law, a person who accepts a written contract without first undertaking this review generally bears the risk that the agreement may contain provisions they

23

do not like or expect." *Wu*, 43 N.Y.3d at 299–300. Simply put, Rogers voluntarily signed the Personal Guaranty and he is bound by its terms, regardless of any after-the-fact objections. *Metzger*, 227 N.Y. at 416.

Rogers's second argument in his attempt to demonstrate that the Personal Guaranty is invalid and unenforceable is that it purports to apply to a non-existent promissory note from September 28, 2022, rather than the real one from October 12, 2022. (Doc. 87 at 7–11.) According to Rogers, this court can only find that he meant to guarantee a promissory note from September 28, 2022, because "New York law is clear that guaranties are **strictly construed** and a guarantor 'should not be found liable beyond the **express terms** of the guaranty.'" (Doc. 87 at 9 (quoting *Solco Plumbing Supply, Inc. v. Hart*, 999 N.Y.S.2d 126, 128 (N.Y. App. Div. 2014)). In making this argument, Rogers overlooks the fact, discussed *supra*, that "a court may correct a scrivener's error outside of a claim for reformation of a contract in those limited circumstances where some absurdity has been identified." *NCCMI, Inc., LLC*, 226 A.D.3d at 94. Here, for all the reasons outlined *supra*, "there is no mistake about the agreement [between Rogers and Northern Data,] and the only mistake alleged is in the reduction of that agreement to writing." *Broadway*, 62 N.Y.S.3d at 188. Accordingly, the court may enforce their intention that Rogers guarantee the only promissory note ever executed by Onyx in favor of Northern Data.

Furthermore, although Rogers is correct that New York law requires a guaranty to be interpreted in accordance with its strict terms, *Cooperatieve Centrale Raiffeisein-Boerenleenbank, B.A.*, 25 N.Y.3d at 492–93, this does not mean, as Rogers implies, that parties to a contract are exclusively committed to the terms of the document they sign: if this were the case, there would be no need for the doctrines of scrivener's error, revocation, or reformation. Rather, strictly interpreting guaranties according to their plain terms means that one party cannot force the other to assume some obligation not captured or contemplated by the contract. This distinction is captured well by *Solco Plumbing Supply, Inc., v. Hart*, 999 N.Y.S.2d 126 (N.Y. App. Div. 2014), a case Rogers relies on for the proposition that he cannot be forced to guarantee the October 12th note because the Personal Guaranty only refers to the non-existent September 28th note, (doc. 87 at 9). In *Solco*, the plaintiff was Solco Plumbing Supply, Inc., and the defendant was Gary Hart, the former vice president of non-party Gotham Plumbing and Sprinkler Corporation. 999 N.Y.S.2d at 127–28. Solco and Gotham entered into an agreement in which Solco agreed to sell certain goods to Gotham on credit, and Hart, as Gotham's vice president, personally guaranteed its payment. *Id.* at 127. Crucially, the guaranty Hart signed stated that he was doing so because he was "*financially interested in*" Gotham and it "contained no provision requiring [Hart] to notify Solco in the event that his financial interest in Gotham was terminated." *Id.* at 127–28. After executing this

25

guaranty, Hart sold his financial interest in Gotham, which defaulted on the terms of its agreement with Solco. *Id.* at 128. When Hart did not pay Solco on Gotham's behalf pursuant to the guaranty, Solco sued him. *Id.* Hart moved to dismiss the claim against him on the theory that the guaranty he signed, by its plain terms, required that he have a financial interest in Gotham, which was no longer the case at the time that it defaulted on the terms of its agreement with Solco. *Id.* The trial court granted his motion and dismissed Solco's case. *Id.*

On appeal, the New York Supreme Court affirmed the trial court's dismissal. *Id.* The appellate court's decision was based on the principle of New York law that "[t]he terms of a guaranty are to be strictly construed and a guarantor should not be found liable beyond the express terms of the guaranty," *id.*, the principle for which Rogers cites *Solco.* Although Rogers is correct—both about this point of law and the *Solco* court's reliance thereon—he misapplies it to his case. In *Solco*, the plaintiff sought to impose a wholly new obligation onto the defendant at odds with the plain terms of the guaranty, i.e., forcing Hart to cover Gotham's financial obligations *after* his financial interest in the company ended. That is manifestly not what is happening in this case: Northern Data is seeking to have Rogers do nothing more or less than what he, by his signature, agreed he would do and guarantee Onyx's obligations under the Amended Agreement. Unlike in *Solco*, there is no question of imposing a *new* obligation upon Rogers, as Northern Data only seeks to enforce the Personal

Guaranty in accordance with the parties' true intentions. Therefore, although Rogers is correct that guaranties are to be strictly enforced according to their plain terms, that principle does not, under the undisputed facts of this case, excuse him from complying with the Personal Guaranty.

Thus, none of the legal theories Rogers advances in his Motion for Summary Judgment can overcome the plain terms of the Personal Guaranty he admits he signed. For these reasons, Rogers has not shown that he is entitled to judgment as a matter of law and his Motion for Summary Judgment must therefore be denied.

c. Damages

Having found that Northern Data is entitled to summary judgment on its breach of guaranty claim against Rogers, the court turns to the question of damages. *See, e.g.*, *Wells Fargo Bank, Nat'l Ass'n v. Choice Medicine: Hwy 53 Med. Ctr.*, 614 F. Supp. 3d 1022, 1027–29 (N.D. Ala. 2020) (awarding damages to the plaintiff at the summary judgment stage on a breach of guaranty claim). For all of the reasons discussed *supra*, the court finds there is no genuine dispute that the Personal Guaranty obliges Rogers to pay Northern Data the Debt of $812,319.41 confirmed by this court. This is the exact sum Northern Data seeks in its Motion for Summary Judgment, (doc. 85 at 1), while also seeking "attorneys' costs, expenses, and fees incurred with respect to this action," *id.* at 2. New York law "follows the general rule that attorney's fees are incidents of litigation and a prevailing party may not

27

collect them from the loser **unless an award is authorized by agreement between the parties."** *Matter of Part 60 Put-Back Litig.*, 36 N.Y.3d 342, 361 (N.Y. 2020) (emphasis added). Accordingly, New York law permits the award of attorneys' fees if the parties have expressly consented. *See, e.g.*, *TAG 380, LLC v. ComMet 380, Inc.*, 10 N.Y.3d 507, 515 (N.Y. 2008); *Integrity Real Estate Consultants v. Re/Max of N.Y., Inc.*, 185 N.Y.S.3d 160, 165 (N.Y. App. Div. 2023). The Supreme Court of New York has held the following about attorneys' fees:

> An award of an attorney's fee pursuant to a contractual provision may only be enforced to the extent that the amount is reasonable and warranted for the services actually rendered. In determining reasonable compensation for an attorney, the court must consider such factors as the time, effort, and skill required; the difficulty of the questions presented; counsel's experience, ability, and reputation; the fee customarily charged in the locality; and the contingency or certainty of compensation. While a hearing is not required in all circumstances, **the court must possess sufficient information upon which to make an informed assessment of the reasonable value of the legal services rendered.** There must be a sufficient affidavit of services, detailing the hours reasonably expended  and the prevailing hourly rate for similar legal work in the community.

*Citicorp Trust Bank, FSB v. Vidaurre*, 65 N.Y.S.3d 237, 239 (N.Y. App. Div. 2017) (internal citations, quotation marks, and ellipses omitted) (emphasis added).

The Personal Guaranty signed by Rogers explicitly states that it extends to "the reasonable fees and expenses of [Northern Data's] counsel [] in any way relating to the enforcement or protection of [Northern Data's] rights hereunder." (Doc. 86-1 at 37). The court therefore finds that Rogers and Northern Data sufficiently

contracted for the provision of attorneys' fees in this case and they will be appropriately included in the award of damages.

## CONCLUSION

For all of the reasons set forth above, the court **ORDERS** as follows:

1. Plaintiff Northern Data NY, LLC's Motion for Summary Judgment, (doc. 85), is **GRANTED**.

2. Defendant Paul Rogers's Motion for Summary Judgment, (doc. 84), is **DENIED.**

3. On or before **April 30, 2026,** Plaintiff Northern Data **SHALL** submit to the court proof of its attorneys' costs, expenses, and fees incurred with respect to this action. Such proof shall be detailed enough for the court to determine whether such fees are reasonable and proportional to the needs of the case. Defendant Rogers **MAY** file a response on or before **May 14, 2026.**

4. The court **DEFERS** awarding damages and entering a final judgment until after calculating attorneys' fees.

**DONE** and **ORDERED** on March 31, 2026

_____
**HAROLD D. MOOTY III**
UNITED STATES DISTRICT JUDGE

29